IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA RIVER WATCH and
COAST ACTION GROUP,

    Plaintiffs,

  v.

PACIFIC GAS AND ELECTRIC
COMPANY,

    Defendant.

No. C 17-05874 WHA

**ORDER GRANTING
MOTION TO DISMISS**

## INTRODUCTION

In this action for declaratory and injunctive relief under the Endangered Species Act, defendant moves to dismiss the amended complaint. The motion is **GRANTED**.

## STATEMENT

This is an action for declaratory and injunctive relief under Section 9 of the Endangered Species Act by plaintiffs California River Watch and Coast Action Group against defendant Pacific Gas and Electric Company. PG&E previously moved to dismiss the original complaint (Dkt. No. 13). Rather than oppose that motion, plaintiffs filed an amended complaint. PG&E again moves to dismiss (Dkt. No. 25). The following is taken from the well-pled allegations of the amended complaint (Dkt. No. 18).

California River Watch is a non-profit corporation dedicated to protecting the aquatic environs of California and educating the public about threats to said environs. Coast Action

Group is an organization dedicated to the protection of fishery and water quality resources on the north coast of California. PG&E owns and operates the Potter Valley project, an interbasin water transfer project on the Eel River in Mendocino County, pursuant to a license issued by the Federal Energy Regulatory Commission (*id.* ¶¶ 2, 9–11). This action concerns the impact of the project on the California Coastal Chinook salmon, Coho salmon, and Northern California Steelhead, three fish species that inhabit the Eel River watershed in Sonoma County and Mendocino County. The United States Oceanic and Atmospheric Administration, National Marine Fisheries Service ("NMFS"), has designated each of the three species as threatened or endangered under the ESA (*id.* ¶ 1).

In 1998, pursuant to its FERC license and Section 7 of the ESA, PG&E consulted with federal agencies to prepare a recommendation to FERC for modifications to the project. In 2001 and 2002, PG&E also prepared an Environmental Impact Statement regarding proposed changes in minimum water flow requirements at the project. In 2002, pursuant to the ESA, NMFS issued a biological opinion that PG&E's proposal would jeopardize endangered species, including the fish species at issue here, near the project site. NMFS's biological opinion provided a Reasonably Prudent Alternative, which PG&E agreed to implement, to reduce the "taking" of such species within the meaning of the ESA. NMFS's biological opinion also provided for reevaluation of the "summer flow" component of the RPA after ten years of monitoring to determine if additional measures or changes are necessary (*id.* ¶¶ 18–21). Significantly, although the amended complaint glosses over it, NMFS also issued an Incidental Take Statement to FERC at the conclusion of its Section 7 consultation (*see* Dkt. Nos. 25 at 3, 28 at 2). A "taking" subject to and compliant with the terms and conditions of an ITS is not a prohibited "taking" under the ESA. 50 C.F.R. § 402.14(i)(5).

The amended complaint does not discuss specific terms of the 2002 ITS. Nor does it append NMFS's 2002 biological opinion or ITS, though plaintiffs ostensibly possess both.[*]

---

[*] PG&E requested — and continues to request — judicial notice of the biological opinion and other background documents in connection with its original motion to dismiss (Dkt. No. 15). The request is unopposed and **GRANTED**. PG&E's second request for judicial notice of a document not relied upon in this order (Dkt. No. 27) is **DENIED AS MOOT**.

2

Since 2002, according to the amended complaint, PG&E has failed to implement or violated certain unspecified management measures required by NMFS's biological opinion. Moreover, the amended complaint alleges the RPA provided for low water flows that threaten protected salmonids by raising water temperatures, lowering oxygen levels, and benefitting predatory warm water species like the Sacramento pike minnow. Unspecified aspects of PG&E's operation of the project cause water diversions that produce such low flows. According to the complaint, salmon populations in the Eel River are nearly exhausted and may be irreversibly lost in the near future (Dkt. No. 18 ¶¶ 20, 22–24).

Based on the foregoing allegations, plaintiffs contend PG&E's operation of the project has permanently destroyed critical habitat necessary to the fish species at issue, thereby "harming" and "harassing" said species. Plaintiffs thus seek to hold PG&E liable for an unlawful "taking" of the species under the ESA. PG&E moves to dismiss. This order follows full briefing and oral argument.

## ANALYSIS

PG&E contends the amended complaint must be dismissed because (1) plaintiffs have failed to state a claim for relief; (2) plaintiffs have failed to provide sufficient notice under the ESA; (3) insofar as plaintiffs complain of the NMFS's 2002 ITS, their claims are barred by the statute of limitations; and (4) plaintiffs' claims are not ripe for judicial resolution. To avoid the statute of limitations problem, plaintiffs clarify that they do not challenge the legality of NMFS's 2002 ITS but merely accuse PG&E of exceeding the "taking" authorized thereunder (*see* Dkt. No. 28 at 14 n.5). This disclaimer, however, exacerbates the pleading problem. It makes clear that the amended complaint must not only allege facts sufficient to show a "taking" by PG&E but also allege facts sufficient to show that such "taking" exceeded the scope of PG&E's authorization under the 2002 ITS. This order concludes the amended complaint fails to do so, and accordingly does not reach PG&E's additional arguments about notice and ripeness.

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A

claim has facial plausibility when the party asserting it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a motion to dismiss, a court may generally consider only allegations in the pleadings, attached exhibits, and matters properly subject to judicial notice. The court accepts factual allegations in the complaint as true and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008). Conclusory allegations or "formulaic recitation of the elements" of a claim, however, are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681.

Section 9 makes it unlawful for any person to "take" any endangered species within the United States. 16 U.S.C. § 1538(a)(1)(B). "Take" is broadly defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The implementing regulation states:

> Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. . . .
>
> Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3.

PG&E contends the amended complaint fails to allege specific facts regarding any actual taking of fish, facts showing that any actions by PG&E actually *caused* any such taking, or facts showing that any such taking exceeded that authorized by the 2002 ITS. This order agrees. Plaintiffs' opposition brief repeatedly cites to the amended complaint, but those citations are to conclusory statements that do not allege *factual* details and are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681. For example, plaintiffs point to paragraph 25 of the amended complaint, which reads (Dkt. No. 18):

> [A]s evidenced by decreasing numbers of the SPECIES in the Eel River, and by non-compliance with the NMFS [biological opinion]

4

> and the incidental take statement . . . and thus, in clear violation of ESA, PG&E's actions in operating the Project are not providing anticipated benefits to the SPECIES in compliance with the RPA and have modified the SPECIES' habitat, which modification will impair the SPECIES' essential behavior patterns. Therefore, PG&E's actions as described herein will result in what NMFS has determined as "take" levels. Thus PG&E's actions as described herein have resulted in a "take" as prohibited by ESA § 9.

This paragraph alleges the fish species at issue are in decline in the Eel River but otherwise simply asserts in conclusory terms that PG&E has in some unspecified way failed to comply with the ITS, violated the ESA, and modified the species' habitat in a way that will impair essential behavior patterns. It is impossible to discern from this paragraph, or the rest of the amended complaint, what the complained-of project operations are or how PG&E has exceeded the scope of taking authorized by the 2002 ITS. At best, statements like the one quoted above provide bare recitation of the elements of the claim coupled with mere conclusions that PG&E is liable under Section 9.

Even at its most factually detailed, the amended complaint falls short of actually stating a claim under Section 9. For example, the amended complaint explains that "[t]he blockage of passage for spawning salmonid by man-made structures such as are part of the Project are known to be a direct cause in the decline of the species" (*id.* ¶ 15), and that PG&E's water diversion operations deplete needed flows, resulting in higher water temperatures, lower oxygen levels, and increased predation harmful to protected species (*id.* ¶¶ 23–24). The former does not allege that any part of the project actually blocks spawning passages for protected species, much less that any such blockage exceeds the authorization of the 2002 ITS. The latter actually states outright that the RPA in NWFS's 2002 biological opinion provided for the complained-of low flows, indicating that PG&E's water diversion operations, even if harmful to salmonids in the Eel River, have not exceeded the 2002 ITS. If so, then such water diversion operations cannot be the basis of any liability against PG&E under Section 9.

In their opposition brief and during oral argument, plaintiffs added a few factual details about the requirements of the 2002 ITS — for example, that PG&E had to provide sixty thousand dollars annually to fund the costs of implementing a pike minnow suppression program (and, according to plaintiffs, failed to do so) (*see* Dkt. No. 28 at 16). Factual details

5

not alleged in the amended complaint, however, cannot evade dismissal under FRCP 12(b)(6) just because they surface in attorney argument.

The foregoing examples are not exhaustive but illustrate the numerous deficiencies in the amended complaint. Surely, under these circumstances both sides are in a position to supply more factual details than what has been provided. In light of the depth of information clearly available to plaintiffs, the amended complaint's nebulous accusations and conclusory assertions seem like a deliberate attempt to vague out, perhaps to keep open for as long as possible plaintiffs' options in actually proving the causal elements that would be required to ultimately prevail on their claims against PG&E.

In summary, the amended complaint contains insufficient allegations to permit any reasonable inference that PG&E caused a "taking" of protected species in excess of its authorization under the 2002 ITS and in violation of the ESA. It must therefore be dismissed.

## CONCLUSION

To the foregoing extent, defendant's motion to dismiss is **GRANTED**. Plaintiffs' amended complaint is **DISMISSED**. Plaintiffs may move for leave to file a second amended complaint by **MARCH 7 AT NOON**. Any such motion should include as an exhibit a redlined version of the proposed amendment that clearly identifies all changes from the amended complaint. This order highlighted certain deficiencies in the amended complaint, but it will not necessarily be enough to add a sentence parroting each missing item identified herein. For example, the proposed amendment should take care to address the other criticisms raised by defendant but not reached in this order. If plaintiffs move for leave to file a second amended complaint, they should be sure to plead their best case.

**IT IS SO ORDERED.**

Dated: February 21, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE